UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

GARY TAYLOR,

        Plaintiff,

    v.

DEFENSE FINANCE & ACCOUNTING
SERVICE; UNITED STATES OF
AMERICA; DAVID S. BALDWIN;
HARRY M. WYATT III; MARK
GROVES; TERESA MCKAY; DOES
ONE through TEN,

        Defendants.

NO. CIV. 2:12-2466 WBS DAD

MEMORANDUM AND ORDER RE: MOTIONS
FOR SUMMARY JUDGMENT

----oo0oo----

        These motions for summary judgment come before the
court on the following four claims: (1) a claim against defendant
Defense Finance and Accounting Service ("DFAS") for violations of
the Privacy Act, 5 U.S.C. § 552a; (2) a claim against defendants
Major General David S. Baldwin, Lieutenant General Harry M. Wyatt
III, Lieutenant Colonel Mark Groves, and Teresa McKay, the
director of DFAS, for deprivation of due process in violation of

1

1  42 U.S.C. § 1983; (3) a _Bivens_ claim against Wyatt and McKay; and

2  (4) a claim against the United States of America for intentional

3  infliction of emotional distress.  Each of these claims arises

4  from plaintiff Gary Taylor's allegations that defendants

5  attempted to recoup over $140,000 in pay ("the overpay debt")

6  that plaintiff lawfully earned as a colonel in the California Air

7  National Guard ("CANG").  Although the court for the following

8  reasons grants defendants' motions for summary judgment on the

9  four claims at issue, it expresses no opinion with regard to the

10  validity of the overpay debt itself, and enters this Order

11  without prejudice to any subsequent claims, not disposed of in

12  this Order, properly seeking an adjudication of the validity of

13  the overpay debt.

14  I.   Factual & Procedural History

15       In 2003, plaintiff took a leave of absence from his job

16  as an airline pilot to serve as a full-time military technician

17  for CANG.  (First Amended Complaint ("FAC" ¶ 15 (Docket No. 21).)

18  In 2009, plaintiff was promoted to Commander of the 144th Fighter

19  Wing of the Fresno Air National Guard ("FANG").  (Id.)  The Air

20  Force required the 144th Fighter Wing to provide pilots to serve

21  4380 individual eight-hour alert duty periods each year.  (Id. ¶

22  29.)  The 144th Fighter Wing attempted to fulfill this obligation

23  by permitting aircraft technicians – including plaintiff – to

24  serve alert duty periods and to collect dual compensation for

25  doing so.  (See id. ¶¶ 30-32.)

26       In May 2010, an audit team from the National Guard

27  Bureau audited the 144th Fighter Wing and noted that some pilots

28  "may have received pay twice in one day."  (Pl.'s Ex. 16 (Docket

No. 48-4).)   Plaintiff then requested a legal review from CANG to determine whether the 144th Fighter Wing's practice of dual compensation had violated any military regulations.  (Pl.'s Statement of Undisputed Facts ("PSUF") ¶ 10 (Docket No. 48-2).) Although Colonel Greg Strickland, the CANG Staff Judge Advocate, concluded that FANG had acted "reasonably and within their proper authority," (Pl.'s Ex. 10 (Docket No. 48-4)), plaintiff was removed from his position as the commander of the 144th Fighter Wing on July 28, 2010.  (FAC ¶ 36.)

In June 2010, Lieutenant General Harry M. Wyatt III, the director of the Air National Guard, attended a conference in Dallas, Texas at which plaintiff was present.  (See Pl.'s Exs. 12, 12A (Docket No. 48-4).)  Wyatt told an audience at the conference "that the pilots in Fresno were under investigation, that they were guilty, and that they would be court-martialed." (See PSUF ¶ 14.)  A confidential informant averred that Wyatt also walked into a conference room at that event and stated that "one of you . . . made three times more than me and I'm a three star general" while staring directly at plaintiff.  (Pl.'s Ex. 12.)  Wyatt then told the audience that plaintiff had made approximately $350,000 and that "this guy might want to get a lawyer."  (Pl.'s Ex. 12A.)

On August 31, 2010, the National Guard Bureau issued a preliminary draft report of its findings during the audit of the 144th Fighter Wing.  (Pl.'s Ex. 16 (Docket No. 48-4).)  Derrick E. Miller, the author of the report, stated in an attached memorandum that Wyatt had ordered the audit.  (Id.)  The report concluded that the 144th Fighter Wing had paid approximately

3

1  $2,475,000 in improper dual compensation over the prior six

2  years, and that "due to ineffective and inadequate internal

3  controls . . . dual compensation risks could not be properly

4  mitigated." (Id.)  The report also recommended that the

5  California National Guard "instate recoupment actions" for the

6  money that was overpaid.  (Id.)

7       In October 2010, Charles Piller, an investigative

8  reporter for the Sacramento Bee, began to write a series of

9  articles about alleged corruption in the California National

10 Guard. (Pl.'s Ex. 54 (Docket No. 48-3).)  On December 19, 2010,

11 The Bee published a piece in which it was alleged that the pilots

12 of the 144th Fighter Wing were "dozing for dollars" and

13 improperly receiving dual compensation. (Pl.'s Ex. 55 (Docket

14 No. 48-3).)  The article noted that Taylor was relieved of his

15 command of the 144th Fighter Wing, that he was "on pace to earn

16 $316,000," and that "[a]uditors estimated that more than 40

17 percent of his recent income was improper." (Id.)  The article

18 quoted John Crocker, a Colonel in the California National Guard,

19 who stated that "[t]here is a minimum an appearance that

20 (commanders) self-enriched" and that Brigadier General Mary J.

21 Kight, the Adjutant General of the California National Guard,

22 "had lost full faith and confidence in Taylor's leadership

23 skills." (Id.)

24      On March 10, 2011, The Bee published another piece

25 which criticized the promotion of four of the accused pilots in

26 the 144th Fighter Wing to command positions. (Pl.'s Ex. 57

27 (Docket No. 48-3).)  This article quoted Wyatt, who commented

28 that he had "great faith and confidence in the men and women of

4

1   the 144th Fighter Wing" and that it was "unfortunate that the

2   alleged actions of a few have brought discredit to those men and

3   women."  (Id.)  During that month, Colonel Larry McKoane, a

4   former commander of the 144th Fighter Wing, attended an Air

5   National Guard Core Values Conference in Portland, OR, where he

6   avers that Wyatt spent the majority of his presentations

7   describing the alleged misconduct by the 144th Fighter Wing.

8   (Pl.'s Ex. 69 (Docket No. 48-3).)  Sabrella Bacon, an attendee at

9   a May 2011 Executive Safety Summit in Orlando, FL, states that

10  Wyatt devoted almost all of his presentation on "Ethics and

11  Leadership" to discussing the alleged dual compensation

12  violations.  (Pl.'s Ex. 68 (Docket No. 48-3).)  Bacon states that

13  when she told another attendee that she was "embarrassed" by

14  Wyatt's statements, that person responded that she "had heard it

15  all before at a previous conference."  (Id.)

16       On November 18, 2011, plaintiff retired from military

17  service and received an honorable discharge.  (See FAC ¶ 66; U.S.

18  & DFAS Statement of Undisputed Facts ¶ 66 (Docket No. 40-1).)  On

19  December 12, 2011, Colonel Mark Groves, the Comptroller of the

20  144th Fighter Wing, informed plaintiff that he would submit the

21  debt that plaintiff was allegedly overpaid (the "overpay debt")

22  to DFAS for recoupment and provided him with a sample letter of

23  indebtedness.  (Pl.'s Ex. 30 (Docket No. 48-4).)  That letter

24  informed plaintiff that if he disagreed with the overpay debt, he

25  could appeal the validity of the debt, request a waiver of the

26  debt, or apply to the Air Force Board for Correction of Military

27  Records, which was authorized to correct the record of the debt.

28  (Id.)  Plaintiff's attorney then attempted to obtain his military

5

1  records from Groves, who instructed him that he would need to

2  contact DFAS in order to obtain those records.  (See Pl.'s Exs.

3  31-32 (Docket No. 48-4).)

4          On May 17, 2012, plaintiff received a letter from DFAS

5  informing him that the overpay debt amounted to $142,698.58 and

6  instructing him to repay the debt by June 16, 2012.  (Pl.'s Ex.

7  33 (Docket No. 48-4).)  On June 6, 2012, plaintiff's wife was

8  denied credit while shopping for a refrigerator at Sears.  (See

9  Pl.'s Ex. 35 (Docket No. 48-4).)  Plaintiff then obtained a copy

10 of his credit report from Experian, which stated that plaintiff

11 was past due on the overpay debt, that the account had been

12 closed and referred for collection, and that plaintiff was more

13 than 120 days past due on the account.  (See Pl.'s Ex. 36 (Docket

14 No. 48-4).)  On July 12, 2012, the Treasury Department contacted

15 plaintiff's mother, sought to ascertain his whereabouts, and

16 asked for his phone number.  (See Pl.'s Ex. 39 (Docket No. 48-

17 4).)  On July 24, 2012, plaintiff received a letter from the

18 Treasury Department stating that his account had been referred

19 for collection, that he now owed $182,956.29, and that he would

20 incur additional penalties if he did not repay the debt within

21 ten days.  (Pl.'s Ex. 40 (Docket No. 48-4).)

22         After DFAS instructed him to repay the overpay debt,

23 plaintiff's attorney wrote a series of letters to DFAS (Pl.'s Ex.

24 38 (Docket No. 48-4)), to the Treasury Department, (Pl.'s Ex. 41

25 (Docket No. 48-4)), and to Baldwin, McKay, and Colonel Sami Said,

26 the commander of the 144th Fighter Wing, (Pl.'s Ex. 42 (Docket

27 No. 48-4)), requesting plaintiff's records and an administrative

28 hearing.  The National Guard Bureau responded on September 20,

2012, and stated that it had forwarded plaintiff's requests for processing by the appropriate agencies.  (Pl.'s Ex. 43 (Docket No. 48-4).)

     In December 2010, DFAS determined that it had erroneously referred plaintiff's debt for collection and ordered the Treasury Department to stop collections and recall the account.  (Pl.'s Ex. 45 (Docket No. 48-4).  DFAS then contacted Taylor and informed him that his debt was prematurely forwarded to the Treasury Department for collections, that it had requested removal of his debt account from the credit bureaus, and that it had removed all interest and fees associated with the overpay debt.  (Pl.'s Exs. 46-47 (Docket No. 48-4.)  Although DFAS maintained that the overpay debt remained valid, it assured plaintiff that it would suspend collection efforts until plaintiff's legal challenges to the validity of the debt were resolved.  (Pl.'s Ex. 46.)

     Plaintiff initiated this action on September 28, 2012 (Docket No. 1), and filed an amended complaint on January 29, 2013 against CANG, FANG, the California National Guard ("CNG"), DFAS, Wyatt, Baldwin, Groves, McKay, and Colonel Sami S. Said. The court dismissed plaintiff's claims against CANG, FANG, and CNG for lack of subject-matter jurisdiction, (Docket No. 26), dismissed plaintiff's claims against Said for failure to effect service, (Docket No. 36), and substituted the United States for Wyatt on plaintiff's intentional infliction of emotional distress claim pursuant to the Westfall Act, 28 U.S.C § 2679(d)(1) (Docket No. 31).  Plaintiff brings four remaining claims: (1) a claim for damages and injunctive relief under the Privacy Act, 5 U.S.C. §

7

552a, against DFAS; (2) a claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq., for intentional infliction of emotional distress against the United States; (3) a Bivens claim against McKay and Wyatt; and (4) a claim under 42 U.S.C. § 1983 against Wyatt, Baldwin, Groves, and McKay.  Defendants now move for summary judgment on each of plaintiff's remaining claims.[1] (Docket Nos. 39-40.)

II.   Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial

---

[1]   Defendants style these motions as "motions for dismissal and summary judgment" and argue both that plaintiff fails to state a claim on which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and that plaintiff has not provided evidence sufficient to withstand summary judgment under Federal Rule of Civil Procedure 56.  (See generally Federal Individuals' Mot. for Dismissal & Summ. J. ("Indiv. Mot.") (Docket No. 39); U.S. & DFAS Mot. for Dismissal & Summ. J. ("U.S. Mot.") (Docket No. 40).)

Because all parties submit and rely upon materials outside the pleadings and had a "reasonable opportunity to present all the material pertinent to the motion," the court must construe these motions as motions for summary judgment.  Fed. R. Civ. P. 12(d); Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996) ("A motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6) must be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 if either party to the motion to dismiss submits materials outside the pleadings in support or opposition to the motion, and if the district court relies on those materials." (citations omitted)).

8

1   burden of establishing the absence of a genuine issue of material
2   fact and can satisfy this burden by presenting evidence that
3   negates an essential element of the non-moving party's case.
4   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
5   Alternatively, the moving party can demonstrate that the non-
6   moving party cannot produce evidence to support an essential
7   element upon which it will bear the burden of proof at trial.
8   Id.

9           Once the moving party meets its initial burden, the
10  burden shifts to the non-moving party to "designate 'specific
11  facts showing that there is a genuine issue for trial.'"  Id. at
12  324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,
13  the non-moving party must "do more than simply show that there is
14  some metaphysical doubt as to the material facts."  Matsushita
15  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
16  "The mere existence of a scintilla of evidence . . . will be
17  insufficient; there must be evidence on which the jury could
18  reasonably find for the [non-moving party]."  Anderson, 477 U.S.
19  at 252.

20          In deciding a summary judgment motion, the court must
21  view the evidence in the light most favorable to the non-moving
22  party and draw all justifiable inferences in its favor.[2]  Id. at

23  _____

24          [2]   On a motion for summary judgment, "[a] party may object
    that the material cited to support or dispute a fact cannot be
25  presented in a form that would be admissible in evidence."  Fed.
    R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party
26  does not necessarily have to produce evidence in a form that
    would be admissible at trial, as long as the party satisfies the
27  requirements of Federal Rules of Civil Procedure 56."  Fraser v.
    Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting Block v.
28  City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001))

                                    9

255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  Id.

    A.   Privacy Act

        The Privacy Act, 5 U.S.C. § 552a, seeks to "protect the privacy of individuals through regulation of the collection, maintenance, use, and dissemination of information by federal agencies."  Rouse v. U.S. Dep't of State, 567 F.3d 408, 413 (9th Cir. 2008) (citations and internal quotation marks omitted).  The Privacy Act does so in part by authorizing "civil relief to individuals aggrieved by failures on the Government's part to comply with [its] requirements."  Doe v. Chao, 540 U.S. 614, 618 (2004).

        Plaintiff's Privacy Act claim against DFAS is premised on four separate statutory provisions: (a) 5 U.S.C. § 552a(d)(2),

---

(internal quotation marks omitted).  Even if the non-moving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the moving party's objections could be cured at trial.  See Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006) (Shubb, J.).
        Plaintiff objects to several of the defendants' statements of undisputed fact on the basis that they are vague, rely on personal knowledge, or call for speculation.  (See Pl.'s Objections & Resp. to U.S.'s Statement of Undisputed Facts (Docket No. 47-1).)  These objections are all duplicative of the summary judgment standard itself, and the court will overrule them.  See Burch, 433 F. Supp. 2d at 1119-20.  Further, for the edification of the parties, this court pays no attention to the parties' statements of undisputed facts in ruling on a motion for summary judgment.  Instead, the court looks to the evidence itself (whether in the declarations, depositions, or discovery responses) referenced in the moving or opposing papers to determine whether there are disputed issues of material fact.

1  which permits any individual "to request amendment of a record

2  pertaining to him"; (b) 5 U.S.C. § 552a(d)(1), which requires

3  federal agencies to permit any individual access to a "record or

4  to any information pertaining to him which is contained in the

5  system"; (c) 5 U.S.C. § 552a(g)(1)(c), which prohibits an agency

6  from "fail[ing] to maintain any record concerning any individual

7  with such accuracy, relevance, timeliness, and completeness" as

8  is necessary to assure that individual is treated fairly; and (d)

9  5 U.S.C. § 552a(b)(12), which prohibits a federal agency from

10 disclosing any individual's record to a consumer reporting agency

11 without his or her consent.  (FAC ¶¶ 78-82.)

12          1.  Record Access

13          The Privacy Act permits a civil claim for a denial of

14 access to records only when an agency "refuses to comply with a

15 request under subsection (d)(1) of this section." 5 U.S.C. §

16 552a(g)(1)(B).  Subsection (d)(1), in turn, requires an agency to

17 furnish access to records "upon request by any individual." 5

18 U.S.C. § 552a(d)(1).  A number of courts, including those in this

19 district, have held that this language requires a plaintiff to

20 exhaust administrative remedies as a precondition to bringing a

21 claim under Section 552a(d)(1).  See, e.g., Tangirala v. Potter,

22 Civ. No. 2:06-384 FCD GGH PS, 2008 WL 2633239, at *18 (E.D. Cal.

23 Jun. 25, 2008) ("Challenges to access, accuracy or amendment of

24 federal agency records must be administratively exhausted before

25 they may be pursued in federal court." (citations omitted));

26 Haase v. Sessions, 893 F.2d 370, 373 (D.C. Cir. 1990) ("The first

27 two causes of action for amendment of records and for access to

28 records incorporate exhaustion requirements."); Sterrett v. Dep't

1   of Navy, No. 09-CV-2083-IEG (POR), 2010 WL 330086, at *4 (S.D.

2   Cal. Jan. 20, 2010) ("[T]here is no doubt the exhaustion of

3   administrative remedies is a prerequisite before a federal court

4   can review a Privacy Act claim seeking access to documents.").

5   And "[a]lthough the Ninth Circuit has not explicitly held" that

6   administrative exhaustion is a prerequisite to bringing a claim

7   under the Privacy Act's record-access provisions, id., it has

8   held that identical statutory language – requiring a "request"

9   and "refusal" – in the Freedom of Information Act incorporates an

10  exhaustion requirement.  In re Steele, 799 F.2d 461, 465-66 (9th

11  Cir. 1986).

12          In order to request records under the Privacy Act, an

13  individual must "address requests for access to records to the

14  appropriate Privacy Act Officer," 32 C.F.R. § 324.10, and must

15  describe the record "well enough to enable it to be located with

16  a reasonable amount of effort on the part of an employee familiar

17  with the file," 32 C.F.R. § 310.18(b)(1)(i).  Plaintiff contends

18  that he "sent a request for production of all records and

19  documents" on June 15, 2012, and a second request on August 27,

20  2012.  (FAC ¶ 70; Pl.'s Exs. 38, 42.)  Plaintiff addressed his

21  June 14, 2012 request for records to "DFAS-Indianapolis" and

22  requested "an opportunity to inspect and review all documents

23  supporting [DFAS's] claim against [plaintiff]."  (See Pl.'s Ex.

24  38.)  Plaintiff then addressed his August 27, 2012 request to

25  Baldwin, McKay, and Said, rather than the appropriate Privacy Act

26  officer. (See Pl's Ex. 42.)  And while that letter requested 18

27  separate documents, (see id.), DFAS found that those requests

28  were frequently "too vague . . . to understand," were not

                                    12

1   intelligible, and asked for information that DFAS did not

2   possess.  (Outlaw Decl. ¶ 20; Outlaw Decl. Ex. 6.)  In short,

3   neither letter complied with the requirements for a "request"

4   under the Privacy Act.

5        In spite of these deficiencies, DFAS routed these

6   letters to Gregory Outlaw, the Privacy Act officer for DFAS, who

7   "coordinated a search for records responsive to Mr. Taylor's debt

8   in accordance with his request." (Outlaw Decl. ¶ 13.)  The DFAS

9   Claims and Debts office was able to locate 41 pages of documents

10  that were responsive to his requests, (id. ¶ 14), and Outlaw sent

11  these documents to plaintiff on March 28, 2013 along with a

12  letter explaining the reasons that he had denied some of

13  plaintiff's record-access and record-amendment requests (id. ¶

14  20; Outlaw Decl. Ex. 6.)  That letter specifically apprised

15  plaintiff of his right to appeal that denial, informed plaintiff

16  of how to file that appeal, and notified plaintiff that he had

17  sixty days to do so.  (Outlaw Decl. Ex. 6.)  Plaintiff did not

18  file that appeal,[3] (see Outlaw Decl. ¶ 22), and he has therefore

19  _____

20       [3]    Plaintiff argues that it would have been inappropriate
    to file an appeal directly with Outlaw, as this appeal would have
21  violated the California Rules of Professional Conduct's
    prohibition on communicating directly with an adverse party who
22  is represented by counsel.  (Pl.'s Opp'n to U.S. Mot. at 18:23-
    19:2.)  The court finds this argument to be pretextual.
23  California Rule of Professional Conduct 2-100(C)(1) contains a
    specific exception for "[c]ommunications with a public officer,
24  board, committee, or body," such as the appeal that Outlaw
    invited plaintiff to file. (See Outlaw Decl. Ex. 6.)  In
25  addition, plaintiff could have contacted the United States
    Attorney, who represented DFAS at this time and who would have
26  consented to filing the appeal with Outlaw.  (See Himel Decl. ¶
    5.)  As a result, plaintiff's alleged concern with the propriety
27  of filing an appeal with Outlaw does not excuse his failure to
    exhaust his administrative remedies.
28

1    not exhausted his administrative remedies.

2         Nor would it have been futile for plaintiff to appeal

3    the denial of his records request.  The Ninth Circuit has

4    recognized that "exhaustion of administrative remedies is not

5    required where exhaustion would have been futile."  <u>Leorna v.</u>

6    <u>U.S. Dep't of State</u>, 105 F.3d 548, 552 (9th Cir. 1997) (citing

7    <u>United Farm Workers of Am. v. Ariz. Agr. Emp't Relations Bd.</u>, 669

8    F.2d 1249, 1253 (9th Cir. 1982)).  But, as plaintiff concedes,

9    "[t]he futility exception applies only when there is a certainty

10   of an adverse decision or further pursuit of administrative

11   remedies would be clearly useless."  (Pl.'s Opp'n to U.S. Mot. at

12   20:11-12 (citing <u>M.K. v. Tenet</u>, 99 F. Supp. 2d 12, 21 (D.D.C.

13   2000).)

14        There is no evidence that an appeal would have been

15   futile.  Plaintiff claims that when he attempted to dispute the

16   debt with the DFAS Protest Audit department, they refused to

17   speak with him over the phone and did not respond to his written

18   communications.  (PSUF ¶ 65; Pl.'s Ex. 41.)  Whatever

19   difficulties plaintiff experienced in communicating with the

20   Protest Audit department are immaterial to whether plaintiff's

21   appeal to Outlaw, who was the designated Privacy Act officer

22   rather than a member of the Protest Audit department, would have

23   been futile.  In fact, the letter that Outlaw sent plaintiff

24   specifically notes that Outlaw could not fulfill all of

25   plaintiff's requests because plaintiff had not submitted the

26   enclosures that his earlier requests had mentioned.  (Outlaw

27   Decl. Ex. 6.)  Had plaintiff simply sent those enclosures

28   alongside his appeal, it is entirely possible that Outlaw could

                                   14

1    have fulfilled some or all of plaintiff's requests for records.

2    (See Outlaw Decl. ¶¶ 18-19 (noting that Outlaw denied plaintiff's

3    records request in part because he failed to provide sufficient

4    "documentary evidence" supporting that request).)   Whether or not

5    it is likely that an appeal would have been fruitful, plaintiff

6    has not shown a certainty of an adverse decision and therefore

7    cannot show that exhaustion of his administrative remedies would

8    have been futile.   See M.K., 99 F. Supp. 2d at 21.

9         Nor does equitable estoppel relieve plaintiff from the

10   burden of exhausting his administrative remedies.   The Ninth

11   Circuit has held that administrative exhaustion requirements are

12   "akin to a statute of limitations" and are therefore subject to

13   equitable estoppel.   Leong v. Potter, 347 F.3d 1117, 1122 (9th

14   Cir. 2003) (citations omitted).   Equitable estoppel relieves a

15   plaintiff of the exhaustion requirement only when "the

16   defendant's wrongful actions prevent[ed] the plaintiff from

17   asserting his claim."   Id. at 1123 (citing Santa Maria v. Pac.

18   Bell, 202 F.3d 1170, 1176 (9th Cir. 2000)).

19        Although plaintiff contends that DFAS "misled" him

20   about how to protest the debt itself, this is immaterial to the

21   question of whether DFAS prevented him from filing a request for

22   records under the Privacy Act.   Nor does plaintiff's extensive

23   reliance on Liguori v. Alexander, 495 F. Supp. 641 (S.D.N.Y.

24   1980), (see Opp'n to U.S. Mot. at 21-25), establish that estoppel

25   is appropriate.   There, a civilian employee at West Point made an

26   oral request to amend his records under the Privacy Act, which

27   Army regulations allowed at that time.   Id. at 646.   An employee

28   relations officer incorrectly advised the plaintiff to pursue his

15

1   Privacy Act request through the Army's grievance procedure,

2   rather than through its established Privacy Act procedure.  Id.

3   at 646-47.  Although defendants then attempted to argue that the

4   plaintiff had not exhausted his administrative remedies, the

5   court held that the defendants were estopped from arguing that

6   plaintiff had failed to exhaust, as the plaintiff had initiated a

7   valid Privacy Act request and failed to pursue his administrative

8   remedies only because he relied on the Army's incorrect advice.

9   Id. at 647.

10          As discussed above, plaintiff's claim is unlike that of

11  the plaintiff's in Liguori because he failed to comply with

12  applicable Privacy Act regulations.  (See Pl.'s Exs. 38, 42.)

13  Nor is there any evidence that DFAS obstructed plaintiff's

14  Privacy Act request.  Indeed, despite plaintiff's failure to

15  address his records requests to the Privacy Act officer or to

16  specify the records he sought to access, DFAS went out of its way

17  to re-rout those requests to Outlaw, coordinate a search for all

18  potentially responsive records, provide those records to

19  plaintiff, inform plaintiff of the reasons it could not provide

20  him with other records, and invite him to appeal.  (See Outlaw

21  Decl. Ex. 6.)  Because plaintiff has not shown that DFAS's

22  actions prevented him from pursuing his request for records under

23  the Privacy Act, DFAS is not estopped from asserting that

24  plaintiff has failed to exhaust his administrative remedies.  See

25  Leong, 347 F.3d at 1122.  Accordingly, the court must grant

26  defendants' motion for summary judgment on plaintiff's record

27  access claim.

28          2.   Record Amendment & Record Defect

16

1    Two of plaintiff's Privacy Act claims are premised on

2  the theory that DFAS violated Section 552a(g)(1)(c) by

3  inaccurately maintaining that plaintiff owed the overpay debt,

4  and that DFAS violated Section 552a(d)(2) by failing to permit

5  plaintiff to amend this record of the overpay debt.  (See FAC ¶¶

6  80, 82.)  But while "[t]he Privacy Act allows for the amendment

7  of factual or historical errors[,] [i]t is not . . . a vehicle

8  for amending the judgments of federal officials or of other

9  parties as those judgments are reflected in records maintained by

10 federal agencies."  Rogers v. U.S. Dep't of Labor, 607 F. Supp.

11 697, 699 (N.D. Cal. 1985) (citing Blevins v. Plummer, 613 F.2d

12 767, 768 (9th Cir. 1980) (per curiam)); see also, e.g., Rosen v.

13 Walters, 719 F.2d 1422, 1425 (9th Cir. 1983) (holding that the

14 Privacy Act cannot be used to "open the back door to judicial

15 review" of agency decisions).

16    Here, plaintiff claims that DFAS's record of the

17 overpay debt is inaccurate because "military regulations and

18 federal law . . . specifically allow[] for any and all pay earned

19 by plaintiff."  (FAC ¶ 51; see also Pl.'s Exs. 1-11 (detailing

20 regulations relating to dual compensation)).  Even if this were

21 so, plaintiff cannot prevail on his record amendment and record

22 defect claims because the determination that plaintiff owed the

23 overpay debt is "not subject to collateral attack" under the

24 Privacy Act.  Rogers, 607 F. Supp. at 700.

25    Douglas v. Agricultural Conservation & Stabilization

26 Service, although not binding here, is particularly instructive.

27 33 F.3d 784 (7th Cir. 1994).  There, a federal agency offered the

28 plaintiff a land conservation contract for 4.2 acres of land,

1   even though plaintiff maintained that she owned six acres of

2   eligible property.  Id. at 784.  The plaintiff then brought a

3   Privacy Act claim and asked the district court to order the

4   defendant to correct its records to show that she owned six acres

5   of eligible land.  Id.  The court held that the plaintiff could

6   not obtain such an order because "the Privacy Act does not permit

7   relitigation of the substance of agency decisions."  Id. at 785.

8   Although the court conceded that the data on which the agency

9   relied was "contestable" and that another agency had concluded

10  that the plaintiff owned six acres of eligible land, it

11  nonetheless held that the plaintiff could not use the Privacy Act

12  to amend the defendant's record that the plaintiff owned only 4.2

13  acres of eligible land because that record "accurately

14  reflect[ed] an administrative action."  Id.

15          Plaintiff's claim, like that of the plaintiff in

16  Douglas, does not dispute DFAS's record of the overpay debt so

17  much as its underlying determination that he owed the debt.  But

18  the Privacy Act presupposes "a distinction between 'records' and

19  'decisions'", id., and plaintiff cannot use his record-amendment

20  claim as a "skeleton key for reopening consideration" of the

21  determination that plaintiff owed the overpay debt.  Rogers, 607

22  F. Supp. at 699.  Accordingly, the court must grant defendants'

23  motion for summary judgment on plaintiff's record amendment and

24  record defect claims.[4]

25          [4]    While plaintiff's record amendment and record defect
26  claims collaterally attack the validity of the overpay debt,
    plaintiff has not sought to cancel the overpay debt or to
27  challenge its validity directly at any point in this action.  The
    court therefore need not, cannot, and does not, reach the
28  question of whether the overpay debt itself is valid.

1              3.   Wrongful Disclosure

2              Plaintiff's final Privacy Act claim alleges that DFAS

3    wrongfully disclosed its record of the overpay debt to credit

4    reporting agencies in violation of Section 552a(b)(12).  (FAC ¶

5    78.)  In order to prevail on this claim, the Privacy Act requires

6    plaintiff to show that one or more employees of DFAS "acted in a

7    manner which was intentional or willful" in disclosing these

8    records.  5 U.S.C. § 552a(g)(4); Rose v. United States, 905 F.2d

9    1257, 1259 (9th Cir. 1990); see Swisher v. Collins, 409 Fed.

10   App'x 139, 141 (9th Cir. 2011) (holding that the district court

11   properly granted summary judgment when plaintiff failed to adduce

12   proof that defendants willfully violated the Privacy Act).

13             Intentional or willful agency conduct "is that

14   amounting to more than gross negligence."  Wilborn v. Dep't of

15   Health and Human Servs., 49 F.3d 597, 602 (9th Cir. 1995),

16   abrogated on other grounds by Doe, 540 U.S. at 618 (citing Rose,

17   905 F.2d at 1260).  "An agency acts in a willful or intentional

18   manner 'either by committing the act without grounds for

19   believing it to be lawful, or flagrantly disregarding others'

20   rights under the Act."  Id. (citing Covert v. Harrington, 876

21   F.2d 751, 757 (9th Cir. 1989)).

22             Although no party disputes that DFAS erroneously

23   disclosed plaintiff's debt to a consumer credit agency, DFAS

24   contends that this disclosure occurred as a result of a

25   programming error, rather than as a result of willful or

26   intentional conduct.  Phillip Tincher, the director of Accounts

27   Receivable for DFAS, avers that DFAS conducted a diagnostic

28   review of its computer systems after plaintiff initiated this

                                19

1    action and discovered that an automated debt management system

2    had identified plaintiff's debt as delinquent and automatically

3    referred the debt to the credit bureaus.  (Tincher Decl. ¶¶ 12-

4    13.)   Once DFAS identified this error, it recalled the debt from

5    the credit bureau and the Treasury Department, waived all

6    interest, penalties, and administrative fees on the debt, and

7    "correct[ed] the programming issue."  (Id.  ¶¶ 14-15.)  Although

8    this programming error may have been negligent, there is no

9    evidence that it was willful or intentional.  Cf. Alexander v.

10   FBI, 541 F. Supp. 2d 274, 277 (D.D.C. 2008) (holding that a

11   "coding error" in Lotus Notes resulting in nondisclosure of e-

12   mails during discovery did not constitute evidence of deliberate

13   misconduct).

14          Plaintiff contends that DFAS's conduct was intentional

15   because it "was on notice the records were false," (Opp'n to U.S.

16   Mot. at 19:23), and because "[s]omewhere in this, human beings

17   were involved" (id. at 27:11).  Read very charitably, these

18   statements appear to assert a theory akin to res ipsa loquitur:

19   that is, that DFAS had a record of plaintiff's debt; that DFAS

20   knew the records were false; that an individual person was

21   involved in the disclosure of the records; and that this

22   unidentified person must have acted willfully at some point in

23   this process.  But while res ipsa loquitur is a viable theory of

24   negligence, it cannot be used to prove intentional or willful

25   conduct.  Johnson v. Am. Airlines, Inc., 834 F.2d 721, 724 (9th

26   Cir. 1987) ("refus[ing] . . . to extend the doctrine to prove an

27   intentional tort"); see also Paige v. U.S. Drug Enforcement

28   Admin., 818 F. Supp. 2d 4, 15 (D.D.C. 2010) ("To the extent

1   Plaintiff relies on the common law tort doctrine of <u>res ipsa</u>

2   <u>loquitur</u> to support a Privacy Act violation, courts have long

3   held such arguments to be meritless."). Absent specific evidence

4   of willful or intentional conduct, plaintiff cannot survive

5   summary judgment on his wrongful disclosure claim.[5] <u>See Wilborn</u>,

6   49 F.3d at 602. Accordingly, the court must grant defendant's

7   motion for summary judgment on this claim.

8       B.   <u>Bivens Claim</u>

9       In <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of</u>

10  <u>Narcotics</u>, 403 U.S. 388, 397 (1971), the Supreme Court held that

11  a violation of the Fourth Amendment by a federal agent while

12  acting under the color of his federal authority gives rise to a

13  cause of action for damages. The court has subsequently extended

14  the <u>Bivens</u> cause of action to apply to violations of the Fifth

15  Amendment as well. <u>Davis v. Passman</u>, 442 U.S. 228, 248 (1979).

16  _____

17      [5]   Although plaintiff belatedly now contends that he is
    entitled to conduct further discovery to obtain evidence of

18  willfulness, (<u>see</u> Pl.'s Opp'n to U.S. Mot. at 27:15), his request
    for further discovery is unavailing because plaintiff has not

19  "identified with greater particularity" the evidence he believes
    he would obtain in discovery. <u>Ohno v. Yasuma</u>, 723 F.3d 984, 1013

20  n.29 (9th Cir. 2013). Plaintiff's case for discovery is premised
    principally on his assertion that "there were human beings

21  involved," (Pl.'s Opp'n to U.S. Mot. at 27:15), which fails to
    specify what facts plaintiff hopes to find or how those facts

22  will constitute evidence of willfulness sufficient to defeat
    summary judgment. <u>See California v. Campbell</u>, 138 F.3d 772, 779

23  (9th Cir. 1998) (noting that a request for further discovery
    under Fed. R. Civ. P. 56(d) must show "that the facts sought

24  exist" and "that these sought-after facts are 'essential' to
    resist the summary judgment motion"). Because the evidence of

25  willfulness plaintiff seeks is "almost certainly nonexistent or
    is the object of pure speculation," <u>id.</u> at 779-80 (citation

26  omitted), the court will not permit plaintiff to reopen these
    proceedings in order to conduct further discovery on the issue of

27  willfulness.

28

1          The decision to extend a <u>Bivens</u> cause of action to

2    other factual and legal contexts depends on a two-part inquiry.

3    First, the court must determine "whether any alternative,

4    existing process" is capable of vindicating the Constitutional

5    right at issue.  <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007).

6    The Court has explained that "[w]hen the design of a Government

7    program suggests that Congress has provided what it considers

8    adequate remedial mechanisms for constitutional violations that

9    may occur in the course of its administration, we have not

10   created additional <u>Bivens</u> remedies."  <u>Schweiker v. Chillicky</u>, 487

11   U.S. 412, 423 (1988).  The existence of an alternative remedial

12   process therefore "amounts to a convincing reason for the

13   Judicial Branch to refrain from providing a new and freestanding

14   remedy in damages."  <u>Wilkie</u>, 551 U.S. at 550.

15         Second, even if no such process exists, the court must

16   determine whether any "special factors counseling hesitation"

17   militate against recognizing a <u>Bivens</u> cause of action.  <u>Id.</u>

18   (citing <u>Bush v. Lucas</u>, 462 U.S. 367, 378 (1983)).  "Even where

19   Congress has given plaintiffs no damages remedy for a

20   constitutional violation, the Court has declined to create a

21   right of action under <u>Bivens</u> when doing so 'would be plainly

22   inconsistent with Congress's authority in the field.'"  <u>W. Radio</u>

23   <u>Servs. Co. v. U.S. Forest Serv.</u>, 578 F.3d 1116, 1120 (9th Cir.

24   2009) (quoting <u>Chappell v. Wallace</u>, 462 U.S. 296, 304 (1983)).

25         Here, plaintiff premises his <u>Bivens</u> claim on the

26   allegation that Wyatt and McKay violated plaintiff's Fifth

27   Amendment rights by seeking to deprive him of money that he

28   lawfully earned.  (<u>See</u> Pl.'s Opp'n to Indiv. Mot. at 3-7.)  This

1   claim is unavailing because plaintiff could dispute the

2   overpayment notice by filing a claim with the Air Force Board for

3   the Correction of Military Records ("Correction Board").   The

4   Correction Board is authorized by statute to "correct any

5   military record," 10 U.S.C. § 1552(a), including any pay claim,

6   10 U.S.C. § 1552(c)(1).   The Supreme Court has explicitly held

7   that a military Correction Board is an alternative remedial

8   process that militates against recognizing a <u>Bivens</u> cause of

9   action.   <u>Chappell</u>, 462 U.S. at 303 (holding that the remedial

10   process set forth by the Uniform Code of Military Justice,

11   including the establishment of a Correction Board, "provides for

12   the review and remedy of complaints and grievances" by members of

13   the military).

14        If plaintiff did not prevail before the Correction

15   Board, he would also be entitled to seek judicial review under

16   the Administrative Procedure Act ("APA").   5 U.S.C. § 702;

17   <u>Clinton v. Goldsmith</u>, 526 U.S. 529, 539 (1999) (holding that a

18   member of the military "may challenge a [Correction Board's]

19   decision . . . as final agency action under the Administrative

20   Procedure Act").   The APA "expressly declares itself to be a

21   comprehensive remedial scheme" for <u>Bivens</u> purposes, and the

22   availability of review under the APA "where no other adequate

23   alternative remedy exists further indicates Congress's intent

24   that courts should not devise additional, judicially crafted

25   default remedies."   <u>W. Radio Servs.</u>, 578 F.3d at 1122-23

26   (citations omitted).

27        Plaintiff contends that the availability of review by

28   the Correction Board and under the APA is inadequate because Air

23

1   Force Instruction 36-2603 required plaintiff to exhaust other
2   administrative remedies prior to submitting his claim to the
3   Correction Board.  (Pl.'s Opp'n to Indiv. Mot. at 9.)  But the
4   Supreme Court has held that an administrative exhaustion
5   requirement does not render the administrative process inadequate
6   such as to justify a <u>Bivens</u> cause of action.  See <u>Schweiker</u>, 487
7   U.S. at 424 (holding that the procedure established by the Social
8   Security Act, which requires administrative exhaustion prior to
9   seeking judicial review, was an adequate process that foreclosed
10  recognition of a <u>Bivens</u> remedy).  And even if plaintiff were
11  correct that he could not exhaust his administrative remedies
12  because he never received the service records he requested, this
13  would not entitle him to a <u>Bivens</u> cause of action.  <u>See, e.g.</u>,
14  <u>Mollnow v. Carlton</u>, 716 F.2d 627, 629 (9th Cir. 1983) (holding
15  that plaintiff could not sustain a <u>Bivens</u> claim even when he
16  alleged that his complaints were "ignored by every officer up
17  through the chain of command, thus preventing his access to
18  proper UCMJ review").

19         In short, even if plaintiff were correct in his
20  assertion that his administrative remedies "do not provide
21  complete relief," <u>Bush</u>, 462 U.S. at 388, the availability of
22  administrative review by the Air Force Correction Board and
23  judicial review under the APA constitute an alternative remedial
24  scheme that forecloses plaintiff's <u>Bivens</u> claim.  <u>See</u> <u>Wilkie</u>, 551
25  U.S. at 537. Accordingly, the court must grant defendants' motion
26  for summary judgment on this claim.
27         C.   <u>42 U.S.C. § 1983</u>
28              In relevant part, § 1983 provides:

                              24

1
2
3
4
5

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

6   42 U.S.C. § 1983.  While § 1983 is not itself a source of

7   substantive rights, it provides a cause of action against any

8   person who, under color of state law, deprives an individual of

9   federal constitutional rights or limited federal statutory

10  rights.  Id.; Graham v. Connor, 490 U.S. 386, 393-94 (1989).

11          Here, plaintiff contends that Baldwin, Groves, McKay,

12  and Wyatt deprived him of due process in two distinct ways.[6]

13  First, plaintiff alleges that Wyatt, McKay, Groves, and Baldwin

14  injured his reputation and that they damaged his credit score by

15  referring the overpay debt to the Treasury Department for

16  collection.  (FAC ¶ 92.)  Second, plaintiff alleges that he was

17  deprived of procedural due process because he never received a

18  hearing or an opportunity to challenge the validity of the

19  overpay debt.[7]  (Id. ¶ 93.)  In order to prevail on either

20          [6]   Plaintiff contends that defendants "deprive[d] [him] of
21  his constitutional rights under the Fifth Amendment."  (FAC ¶
    92.)  But because § 1983 applies only to action under color of
22  state law, his claim actually arises under the Fourteenth
    Amendment, which proscribes state action that deprives an
23  individual of life, liberty, or property without due process of
    law.  See U.S. Const. amend. XIV, § 1.
24

25          [7]   At various points in his Opposition, plaintiff also
    contends that Wyatt "made sure that everyone in the military
26  heard his version [of] the facts" about plaintiff's conduct,
    thereby ensuring that "had plaintiff been subject to court
27  martial, he could have never received a fair trial."  (Opp'n to
    Indiv. Mot. at 7:5-6, 12:6-8.)  This assertion cannot give rise
28  to a § 1983 claim because plaintiff was never subject to court
    martial or to any proceeding in which he could have been deprived

25

1   claim, plaintiff must first show that he was deprived of "a

2   liberty or property interest protected by the Constitution."

3   Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 62

4   (9th Cir. 1994) (citing Bd. of Regents v. Roth, 408 U.S. 564, 577

5   (1972)).

6                    1.   Plaintiff's Reputation & Credit Rating

7                  Although plaintiff claims to have a constitutionally

8   protected interest in his reputation, both the Supreme Court and

9   Ninth Circuit have repeatedly held that injury to one's

10  reputation alone does not constitute a deprivation of liberty or

11  property.  See, e.g., Paul v. Davis, 424 U.S. 693, 701 (1976)

12  (denying that "reputation alone, apart from some more tangible

13  interests such as employment, is either 'liberty' or 'property'

14  sufficient to invoke the procedural protection of the Due Process

15  Clause"); WMX Techs., Inc. v. Miller, 197 F.3d 367, 376 (9th Cir.

16  1999) (en banc) (noting that "reputation alone is not an interest

17  protected by the Constitution").  While plaintiff cites several

18  passages from the dissent in Siegert v. Gilley, 500 U.S. 226

19  (1991), in order to argue that he has a protected interest in his

20  reputation, (see Pl.'s Opp'n to Indiv. Mot. 10-11), the Supreme

21  Court held the exact opposite: that Siegert's interest in his

22  reputation, like plaintiff's interest, "lack[s] any

23

24  of liberty or property.  See Raduga USA Corp. v. U.S. Dep't of
    State, 284 Fed. App'x 404, 405 (9th Cir. 2008) ("The requirements
25  of procedural due process . . . attach only to the deprivation of
    constitutionally protected liberty and property interests.")
26  (citing Roth, 408 U.S. at 569).  In fact, there is no evidence
    that the military took any disciplinary action against plaintiff,
27  and plaintiff does not dispute that he received an honorable
    discharge in 2011.  Accordingly, to the extent that plaintiff's §
28  1983 claim is based on this allegation, the court must grant
    defendant's motion for summary judgment.

                                  26

1  constitutional protection." Id. at 234.

2          In Paul v. Davis, the Supreme Court recognized a narrow

3  exception to this rule -- namely, that reputational injury,

4  combined with "depriv[ation] . . . of a right previously held

5  under state law," an "alteration of legal status," or a similar

6  infringement of a protected liberty interest, is cognizable under

7  § 1983.  424 U.S. at 708-09.  Plaintiff relies on this "stigma-

8  plus" exception to argue that, as a result of his reputational

9  injuries, he was unable to obtain future government employment or

10  to obtain credit.  But as the Court has clarified, impairment of

11  "future employment opportunities," "out-of-pocket loss," or other

12  sorts of incidental damage that "flows from the injury to . . .

13  reputation" do not constitute deprivations of liberty or

14  property.  Siegert, 500 U.S. at 234.

15          For instance, in Krainski v. Nevada, the plaintiff

16  alleged that her university had "tarnish[ed] her educational

17  transcript and record" by finding that she had violated the

18  student conduct code.  616 F.3d 963, 971 (9th Cir. 2010).  The

19  court acknowledged that, had the university suspended or expelled

20  her for her conduct and thereby caused damaged for her

21  reputation, she would have suffered a deprivation of liberty or

22  property.  Id.  By contrast, the court held that the alleged

23  "loss of future income" and "psychological trauma" that she

24  suffered as a result of this reputational injury were "materially

25  indistinguishable" from the injuries at issue in Paul v. Davis

26  and were not sufficient to satisfy the "stigma-plus" exception.

27  Id.

28          Likewise, even if plaintiff were correct that he had

27

1  suffered consequential harm to his future employment
2  opportunities and credit as a result of the alleged injury to his
3  reputation, that harm would not be cognizable under § 1983.  And
4  while plaintiff contends that defendants acted with malice when
5  they tarnished his reputation, it is well-established that their
6  state of mind is irrelevant to the stigma-plus inquiry.  Siegert,
7  500 U.S. at 234 (denying that plaintiff could satisfy the stigma-
8  plus test if "the defendant acted with malice" because the
9  "decision in Paul v. Davis did not turn . . . on the state of
10  mind of the defendant").  To the extent that plaintiff's § 1983
11  claim relies on damage to his reputation, defendants are entitled
12  to summary judgment.

13       Insofar as plaintiff's alleged injury to his credit
14  rating is distinct from injuries to his reputation, that injury
15  is also not cognizable under § 1983.  Plaintiff has not cited,
16  and the court cannot identify, a single case from the Supreme
17  Court or the Ninth Circuit stating that an individual has a
18  constitutionally protected interest in his credit rating.  The
19  closest the Supreme Court comes to reaching this conclusion is in
20  Connecticut v. Doehr, where the Court held that a Connecticut
21  statute permitting pre-judgment attachment of real property
22  without notice or hearing unconstitutionally deprived individuals
23  of property in part because of the potential harm to their credit
24  rating.  501 U.S. 1, 11-12 (1991); see also Tri-State Dev. Ltd.
25  v. Johnston, 160 F.3d 528, 533 (9th Cir. 1998) (applying Doehr to
26  invalidate Washington's attachment statute and noting the effect
27  of pre-judgment attachment on individuals' credit ratings).  But
28  this concern with the effect of attachment on one's credit rating

28

1   is distinct from recognizing a freestanding property interest in
2   one's credit rating.

3        General Electric Company v. Jackson, 610 F.3d 110 (D.C.
4   Cir. 2010), is instructive.  There, General Electric ("GE")
5   argued that a unilateral administrative order by the EPA
6   directing GE to clean up hazardous waste constituted an unlawful
7   deprivation of property because it would imperil GE's credit
8   rating and ability to raise capital.  610 F.3d at 119.  The court
9   held that GE had no protected interest in its credit rating.  It
10  first rejected GE's contention that Doehr had recognized a
11  property interest in one's credit rating, and held that while
12  Doehr recognized that "partial impairments of property rights may
13  well warrant due process safeguards," Doehr did not recognize
14  that injury to one's credit score, "standing alone, merit[s] due
15  process protection."  Id. at 120.  The court then held that
16  "stripped of its reliance on Doehr," the injury that GE claimed
17  to its credit rating was essentially a reputational injury that
18  "is foreclosed by Paul v. Davis."  Id.

19        As in Jackson, plaintiff has not demonstrated that any
20  injury he suffered to his credit score because of the referral of
21  the overpay debt to the Treasury Department and to the credit
22  bureaus constituted a deprivation of a protected property or
23  liberty interest.  To the extent that plaintiff's § 1983 claim is
24  premised on injury to his credit score, the court must grant
25  defendants' motion for summary judgment.

26              2.   Procedural Due Process

27        "A procedural due process claim has two elements:
28  deprivation of a constitutionally protected liberty or property

29

1  interest and denial of adequate procedural protection."

2  Krainski, 616 F.3d at 970 (citing Brewster v. Bd. of Educ., 149

3  F.3d 971, 982 (9th Cir. 1998)).   Here, plaintiff contends that he

4  was denied procedural due process because he was deprived of a

5  hearing or an equivalent opportunity to challenge the validity of

6  the overpay debt before defendants attempted to recoup the debt.

7       Although the overpay debt constitutes a protected

8  property interest, see Schwarm v. Craighead, 552 F. Supp. 2d

9  1056, 1083 (E.D. Cal. 2008) (Shubb, J.) (noting that "it is

10  undisputed that money constitutes a property interest protected

11  by the Fourteenth Amendment" (citation omitted)), plaintiff has

12  not shown that he has been deprived of any sum of money.   To the

13  contrary, plaintiff has not repaid any portion of the overpay

14  debt.   In contrast to "cases where the government garnishes a

15  plaintiff's wages or levies the plaintiff's bank account,"

16  Schwarm, 552 F. Supp. 2d at 1084, defendants have not yet forced

17  plaintiff to repay the overpay debt; in fact, DFAS specifically

18  ordered the Treasury Department to cease any efforts to collect

19  the debt.   (See Pl.'s Ex. 45.)

20       Nor does the mere notification that plaintiff owed the

21  overpay debt constitute a deprivation of property.   See, e.g.,

22  Schwarm, 552 F. Supp. 2d at 1083-84 (holding that letters to

23  individuals accused of writing bad checks that they must pay the

24  amount of the bad check, a "bad check fee," and a "diversion fee"

25  or face criminal prosecution did not constitute a deprivation of

26  property); cf. Guatay Christian Fellowship v. County of San

27  Diego, 670 F.3d 957, 984 (9th Cir. 2011) (holding that a county's

28  notification to a church that it had violated local zoning

1   ordinances did not constitute a deprivation or liberty or

2   property absent any action by the county to enforce those

3   violations in court).

4            Plaintiff contends that he was deprived of the overpay

5   debt because defendants initiated recoupment efforts and referred

6   his debt to the Treasury Department for collection.  (Pl.'s Opp'n

7   to Indiv. Mot. at 10:1-8.)  In particular, plaintiff presents

8   evidence that Groves referred his debt to DFAS for collection,

9   (see Pl.'s Ex. 44), that the Treasury Department sent plaintiff a

10  letter demanding repayment of the debt, along with interest and

11  penalties, within ten days (see Pl.'s Ex. 40), and that the

12  Treasury Department called plaintiff's mother in order to

13  determine his whereabouts (see Pl.'s Ex. 39).

14           Even if all this were so, these actions would not give

15  rise to a procedural due process claim because plaintiff was not

16  "finally deprived of a property interest" in the overpay debt.

17  Brewster, 149 F.3d at 985-86 (citations and internal quotation

18  marks omitted); accord Parratt v. Taylor, 451 U.S. 527, 540

19  (1981) (noting that "some kind of hearing is required at some

20  time before a state finally deprives a person of his property

21  interests"), overruled in part on other grounds by Daniels v.

22  Williams, 474 U.S. 327 (1986).  Rather, the evidence establishes

23  that DFAS recalled plaintiff's debt account from the Treasury

24  Department, (see Pl.'s Ex. 45), ordered that recoupment efforts

25  cease (see id.), reversed all interest and collection fees (see

26  Pl.'s Ex. 46; see also Tincher Decl. ¶ 14), and requested that

27  the credit bureaus delete his delinquent debt account (see Pl.'s

28  Ex. 47).  To the extent that plaintiff was deprived of any

                                    31

1    interest in the overpay debt, that deprivation was temporary and

2    was remedied promptly once it was discovered.  See, e.g.,

3    Gearhart v. Thorne, 768 F.2d 1072, 1073-74 (9th Cir. 1985)

4    (holding that an employee who was reinstated with back pay after

5    being demoted suffered no final deprivation of a property

6    interest).  Because plaintiff has not been deprived of the

7    overpay debt or any other property interest, the Due Process

8    Clause does not entitle him to a hearing or any additional

9    procedural protections.  Brewster, 149 F.3d at 982; see also Town

10   of Castle Rock v. Gonzales, 545 U.S. 748, 764 (2005) (holding

11   that an "entitlement to nothing but procedure" does not

12   constitute a constitutionally protected interest).  Accordingly,

13   the court must grant defendants' motion for summary judgment on

14   his procedural due process claim.

15          D.    Intentional Infliction of Emotional Distress

16          In Feres v. United States, the Supreme Court held that

17   the Federal Tort Claims Act does not permit members of the

18   military[8] to recover for "injuries which arise out of or are in

19   the course of activity incident to service."  340 U.S. 135, 146

20   (1950) (emphasis added).  Although the contours of the term

21   "incident to service" are imprecise, see McConnell v. United

22   States, 478 F.3d 1092, 1095 (9th Cir. 2007), the meaning of the

23   "arise out of" prong is far clearer: it "encompass[es], at a

24   _____

25          [8]    This limitation applies to claims brought by National
     Guard members in the same way that it applies to any member of
26   the armed services.  See, e.g., Stencel Aero Eng'g Corp. v.
     United States, 431 U.S. 666, 673 (1973); Jackson v. United
27   States, 110 F.3d 1484, 1487 (9th Cir. 1997) ("Members of the
     National Guard and the Reserves are service members under Feres."
28   (citation omitted)).

1    minimum, <u>all</u> injuries suffered by military personnel that are

2    even remotely related to the individual's <u>status</u> as a member of

3    the military . . . ." <u>Estate of McAllister v. United States</u>, 942

4    F.2d 1473, 1479-80 (9th Cir. 1991) (citing <u>Major v. United</u>

5    <u>States</u>, 835 F.2d 641, 644-45 (6th Cir. 1987)).

6          Plaintiff's intentional infliction of emotional

7    distress claim alleges that General Wyatt and his subordinates

8    publicly made "false and malicious statements" about plaintiff in

9    June 2010, December 2010, and March 2011 (FAC ¶¶ 54, 55, 57; PSUF

10   ¶¶ 14-16, 31-33, 43), and that Wyatt and his subordinates

11   "reported that plaintiff . . . owed money for work he did not

12   perform," and "destroyed his reputation and his credit rating"

13   (<u>id.</u> ¶ 133).  This conduct directly related to plaintiff's

14   service in the Air National Guard and his disputed claim that he

15   was entitled to dual compensation.  For instance, plaintiff

16   asserts that Wyatt told an audience at a conference in June 2010

17   that plaintiff and other FANG pilots "were under investigation,

18   that they were guilty, and that they would be court-martialed."

19   (PSUF ¶ 14.)  Likewise, Colonel Crocker met in 2010 with Charles

20   Piller, an investigative reporter with the Sacramento Bee, and

21   told Piller that Brigadier General Kight "had lost full faith and

22   credit in Taylor's leadership skills" and the 144th Fighter Wing

23   received dual compensation only because of inaccurate "guidance

24   from [Colonel] Taylor."  (<u>See</u> Pl.'s Ex. 55.)

25         Moreover, insofar as plaintiff's evidence shows that

26   Wyatt was personally involved in efforts to recover the overpay

27   debt, that evidence shows that Wyatt initiated the audit of

28   plaintiff's service in May 2010, while plaintiff was still on

1    active duty and collecting military pay.  (Pl.'s Ex. 16.)   In

2    fact, plaintiff concedes that he attempted to pursue an identical

3    intentional infliction of emotional distress claim against Wyatt

4    with the California Victim Compensation and Government Claims

5    Board in April 2011, while plaintiff was still on active duty.

6    (Pl.'s Exs. 28-29.)   To the extent that Wyatt's conduct and that

7    of his subordinates arose out of and concerned plaintiff's status

8    as a member of the Air National Guard, plaintiff's intentional

9    infliction of emotional distress claim is barred by Feres.   See

10   Estate of McAllister, 942 F.2d at 1479-80.

11        The fact that plaintiff is currently retired does not

12   affect this result.  While Feres does not bar claims by retired

13   service members for injuries that occurred after their service

14   had concluded, it does bar a claim if the "injured person was a

15   member of the armed forces . . . at the time the injury was

16   sustained."  McGowan v. Scoggins, 890 F.2d 128, 132 (9th Cir.

17   1989).  While plaintiff contends that the "injury . . . occurred

18   on or about June 11, 2012," when he discovered that DFAS had

19   reported that the overpay debt was past due,  (see Pl.'s Opp'n to

20   U.S. Mot. at 14:3-5), this assertion appears to conflate the

21   injury plaintiff allegedly suffered as a result of Privacy Act

22   violations -- which occurred after plaintiff retired -- and the

23   emotional distress and resulting injury he allegedly experienced

24   as a result of Wyatt's conduct, which occurred while plaintiff

25   was still on active duty and which arose from his military

26   service.

27        Even if plaintiff were correct that he continued to

28   suffer harm from Wyatt's conduct after his retirement, that harm

                                   34

1   would be insufficient to overcome Feres so long as Wyatt's

2   tortious conduct took place before plaintiff retired.  See Monaco

3   v. United States, 661 F.2d 129, 133 (9th Cir. 1981) (holding that

4   Feres bars claims for "post-service injury resulting from in-

5   service negligence").  Accordingly, because plaintiff's

6   intentional infliction of emotional distress claim "arose out of"

7   his military service, see Feres, 340 U.S. at 146, the court must

8   grant defendants' motion for summary judgment on this claim.

9           The court notes, in conclusion, that although it must

10  grant summary judgment on each of plaintiff's four remaining

11  claims, none of those claims require the court to adjudicate the

12  underlying question of whether the overpay debt, or any portion

13  thereof, is valid.  Accordingly, the court does not decide that

14  issue today, and enters this Order without prejudice to a

15  subsequent claim directly challenging the validity of the overpay

16  debt or any other claim not otherwise disposed of in this Order.

17          IT IS THEREFORE ORDERED that defendants' motions for

18  summary judgment on each of plaintiff's remaining claims be, and

19  the same hereby are, GRANTED.  If plaintiff wishes to bring any

20  additional claims, not disposed of in this Order, he shall do so

21  in a separate action.

22  Dated:  January 2, 2014

23

24          WILLIAM B. SHUBB
            UNITED STATES DISTRICT JUDGE

25

26

27

28

                            35